IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 20, 2006 Session

## REBECCA LEE BRADSHAW OWINGS
v.
## WILLIAM ALBERT OWINGS

**An Appeal from the Circuit Court for Shelby County**
**No. 144853-2 R.D.     James F. Russell, Judge**

———————————

**No. W2005-01233-COA-R3-CV - Filed November 27, 2006**

———————————

This is a post-divorce petition to modify child support.  When the parties divorced in 1995, the mother was granted custody of the parties' two children, and the father was ordered to pay child support.  The father was self-employed.  In 2003, the mother filed the instant petition to increase the father's child support obligation, alleging that the father's income had increased since the divorce. The mother sought to prove the amount of the father's income by submitting into evidence his bank statements for the previous three-year period, and calculating from that his average monthly deposits. In response, the father filed an affidavit stating that he received less monthly income from his various business interests than the mother's proof indicated.  At trial, he relied on his own testimony, the testimony of his accountant, and the gross income reported on his federal income tax returns.  After a trial, the trial court found the father's testimony credible and concluded that the father's income tax returns were the best evidence of his income.  Based on the tax returns, the trial court held that the father's level of income did not result in a significant variance in his child support obligation and consequently denied the mother's petition. The mother now appeals.  We vacate in part and modify in part, finding that the evidence preponderates against the trial court's holding that the father's income tax returns accurately reflected his income, as that term is defined in the Child Support Guidelines, and find a significant variance in his child support obligation based on the father's pretrial affidavit and his testimony as to his income.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is**
**Vacated in Part, Modified in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Todd A. Snow, Memphis, Tennessee, for the appellant, Rebecca Lee Bradshaw Owings.

James W. Hodges, Jr., Memphis, Tennessee, for the appellee, William Albert Owings.

**OPINION**

Petitioner/Appellant Rebecca Lee Bradshaw Owings ("Mother") and Respondent/Appellee William Albert Owings ("Father") were divorced by final decree on June 28, 1995. The final decree of divorce incorporated the parties' marital dissolution agreement ("MDA"). In the MDA, Mother was designated primary residential parent for the parties' two children, William Michael Owings (born May 14, 1987) and Stephen Roger Owings (born November 21, 1989). Father was required to pay $1,700 per month in child support, an amount set in accordance with the Tennessee Child Support Guidelines.

Almost eight years later, on November 26, 2003, Mother filed a petition to modify Father's child support obligation. In her petition, Mother asserted that Father's income had increased since the 1995 divorce decree was entered. She contended that a "significant variance" existed between Father's child support obligation and the amount of child support that would be required based on his increased income under the Child Support Guidelines.[1] Mother filed an amended petition on December 18, 2003.[2]

On February 12, 2004, the Divorce Referee ("Referee") held a hearing on Mother's petition. Mother, Father, and Father's accountant testified at the hearing before the Referee. Mother explained that she sought an increase in child support because the amount had not been modified since the divorce in 1995. She asserted that Father's income had increased and noted that he had realized a capital gain of $922,000 in 2001. Mother testified that she struggles financially, working overtime and living paycheck to paycheck.[3] She said that she and the children live in an apartment because her house was sold in foreclosure.

Father also testified at the hearing before the Referee. He submitted into evidence his tax returns for the years 2000, 2001, and 2002. Father said that he and his brother own and operate a hotel management business, Owings Properties, LLC, which at the time of the hearing managed about seven hotel properties; Father has a personal interest in four of the hotel properties. Father explained that he and his brother pay themselves from the management company. The amount is based on the projected management fees the company earns, and the payments vary from month to month. Father said that, in 2002 and 2003, the business suffered a downturn; at the time of the hearing, the company had fewer contracts than it did at the time of the 1995 divorce. Father stated that, for the two years preceding the hearing, Owings Properties had paid him $8,000 per month, about $2,000 less per month than he had been paid in previous years. He also receives his health insurance through the company. Each quarter, Father also receives approximately $3,200 in income generated from some of the properties he managed. Father asserted that all of his income was

---

[1]*See* Tenn. Code Ann. § 36-5-101(a)(1)(A) (Supp. 2004).

[2]In the amended petition, Mother requested that, in addition to child support, Father be required to pay for private school tuition for the parties' younger child. That request was denied, and it is no longer an issue in this case.

[3]Mother did not indicate where she worked or how much she earned.

-2-

reflected on his income tax returns. He explained that the capital gain of $922,000 reported on his 2001 tax return resulted from the foreclosure of a property that suffered from substantial operating losses. After the foreclosure, the debt was cancelled, resulting in the capital gain, but Father received no disposable income from the transaction.

Father's accountant, Clyde R. Bean ("Bean"), testified before the Referee as well. Bean prepared Father's personal tax returns, but did not perform accounting work for any of Father's businesses. At the time of the hearing, Father's 2003 returns had not been prepared. Bean asserted that he includes in Father's tax returns all income and distributions that Father receives from every source. Bean stated that K-1 forms were prepared for the thirteen different entities in which Father has an interest, and these were used in preparing Father's personal returns. However, the K-1 forms were not produced at the hearing. Bean explained that the $8,000 per month that Father was paid from his business was actually a draw, and at the end of the year Father would have either a surplus or a deficit balance, depending on the company's earnings. Therefore, Bean said, the fact that Father drew $96,000 for the year ($8,000 per month) from their company did not mean that Father's net income was $96,000. Bean testified that Father's 2000, 2001, and 2002 tax returns reflected all pertinent information regarding Father's income.

After the hearing, the Referee issued a decision which is not included in the record on appeal. The record, however, contains a copy of an order entered by the trial court which affirms the Referee's decision and finds that Father's income had increased to $9,000 per month.[4] Based on that income level, the trial court granted Mother's request to increase Father's monthly child support obligation from $1,700 to $2,023, retroactive to January 1, 2004. Mother's request to modify Father's child support obligation further based on Father's 2001 capital gain was denied. Thereafter, Mother appealed for a *de novo* hearing before the Circuit Court pursuant to Rule 13(f) of the Rules of the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, Shelby County, challenging the denial of her petition to consider Father's 2001 capital gain. Because the trial court's order was in effect pending Mother's appeal, Father made child support payments in the higher monthly amount through the time of the hearing in the trial court below.

After the Referee issued his ruling, Mother received copies of the K-1 tax forms for Father's various business interests, as well as copies of bank statements for Father's personal account and the bank account of his sole proprietorship, First Tennessee Development Corporation ("First Tennessee Development"). On October 4, 2004, Mother took Father's deposition regarding this information.

Prior to trial, the parties filed affidavits on their assets and liabilities in accordance with Rule 14 of the local rules of the court. *See* Rules of the Circuit Court for the Thirtieth Judicial District 14(C) (2006). Under the "Income" section of Father's affidavit, he stated that his rate of pay was $8,000 per month, and that his average monthly gross income was $9,666.67. After deducting taxes, Father listed his net monthly income as $7,926.67.

---

[4]The order affirming the Referee's ruling was entered on July 9, 2004, effective *nunc pro tunc* to the date of the hearing, February 12, 2004.

A bench trial was conducted on October 28 and November 1, 2004. The trial court heard testimony from Mother, Father, and Bean; some of the testimony was repetitive of that adduced at the February 12, 2004 hearing before the Referee. In her brief testimony, Mother told the court that she had twice before attempted to obtain an increase in child support. On those occasions, she said, Father was not forthcoming with the financial information she requested of him, and she could not afford to continue to pursue the matter. She claimed that the children did not enjoy the same lifestyle as they did when she and Father were married. Mother was asked about her Rule 14 affidavit, which showed a loss each month; she admitted that, when child support was taken into account, she actually had a monthly surplus.

Father testified as well. At the outset, by stipulation, Father introduced into evidence numerous exhibits regarding his income, such as his federal tax returns, bank statements, and other relevant documents. These included Exhibit 21, which was a compilation of information taken from the deposits recorded on Father's bank statements for the years 2001, 2002, and 2003.[5] Exhibit 21 categorizes each of the deposits in classifications such as payments from Owings Properties, distributions from other properties, loans, transfers from other bank accounts, or sale of assets. Father stated that, in his work, he manages and operates hotels through Owings Properties. In addition, he performs computer consulting through his sole proprietorship, First Tennessee Development, and is paid wages for this by Owings Properties. Father explained that he does not have a "set form of income." On average, Father asserted, Owings Properties pays him $8,000 each month. Of that total, he deposits $4,000 into his personal bank account and $4,000 into his First Tennessee Development bank account. Prior to 2002, Father received $10,000 per month from Owings Properties. Father characterized the money deposited into his personal account from Owings Properties as "partnership draws," and the money deposited into his First Tennessee Development bank account as "wages." When asked about the reasoning for this payment structure, Father responded, "That's been done like that for years. Why we set it up like that, I'm not sure." Father also testified that, in addition to the $8,000 per month from Owings Properties, he receives about $3,200 per quarter in distributions from hotels in which he has an interest.

On cross-examination, Father was questioned about the bank deposits summarized in Exhibit 21. Exhibit 21 reflects total annual deposits for his two bank accounts in the following amounts: $187,432.32 (2001), $194,438.00 (2002), and $213,971.14 (2003).[6] Thus, for those three years, Father's average annual deposits were $198,613.82, with average monthly deposits of $16,551. Exhibit 21, however, indicates that many of the deposits resulted from the transfer of funds between accounts, draws on a line of credit, loans from Father's father, and other items that would not

_____

[5] It is not disputed that Father treated the First Tennessee Development account as a personal account, that he paid personal expenses from that account, and that the business account should be treated as another individual account for purposes of determining Father's actual income. Consequently, Exhibit 21 included the First Tennessee Development account as well as Father's personal account.

[6] Exhibit 22, submitted by Mother, shows Father's total deposits as $159,220 (2001), $192,264 (2002), and $213,663 (2003), for average annual deposits of $188,382, or average monthly income of $15,699.

constitute income. Excluding such deposits, the total annual funds received from Owings Properties and distributions from other properties, as shown on Exhibit 21, were as follows:

2001
Owings Properties:        $123,000.00
Distributions:        6,277.50
TOTAL        $129,277.50
2002
Owings Properties:        $ 93,500.00
Distributions:        18,675.00
TOTAL        $112,175.00
2003
Owings Properties:        $ 94,000.00
Distributions:        16,205.00
TOTAL        $110,205.00

Thus, from these categories, Exhibit 21 reflects that the average monies that Father received for this three-year period is $117,219 per year or $9,768, per month, an amount slightly higher than the monthly income of $9,666.67 listed in Father's pretrial affidavit.

Exhibit 21 also shows that, over the three-year period, Father deposited approximately $19,000 in "loans" from his father. Father explained that $6,000 of that total was to pay a portion of the private school tuition for the parties' older son. He could not recall the nature of the remainder of the loans. Father conceded that he had not yet repaid his father for any of the money loaned to him; when asked whether this would make the loans in reality gifts, Father responded, "I have no idea."

Father testified that some of the deposits into his bank accounts were withdrawals from the children's savings accounts, but submitted no corroboration of this assertion. He said that other deposits were withdrawals from Father's own savings account, but produced no statements from his savings account. When asked about the amount of money in his savings account, Father said only that it "fluctuates."

Exhibit 21 also showed numerous transfers back and forth between the two accounts, as reflected on the bank statements. Father explained that the transfers were necessary to cover his obligations.

Father asserted that his tax returns reflected all of his income from all sources. In particular, Father said the K-1 forms reflected the monies he received from his various business interests. When asked to explain the discrepancies between the actual deposits in his bank accounts and the income shown on his tax returns, Father responded that "I am not an accountant. I don't know." Similarly, when questioned about the amounts reported on his K-1 tax form for Owings Properties, Father said that he did not know how to read the form, and commented that he "really [doesn't] get

that involved with [the K-1]." Father was challenged about his assertion that he received only $8,000 per month in income from Owings Properties; he responded that he was certain of the amount "[b]ecause I make my own deposits and I know what I get."

Father was also cross-examined about his lifestyle. He said that he purchased a 2002 Tahoe in September 2002. To pay for it, he borrowed on a line of credit with his bank.[7] When the vehicle was used for business purposes, Father was paid by his company for the mileage used. In February 2003, Father bought a boat for $19,288, financing approximately $15,000 of that purchase price. Father was also asked about vacations he had taken. He stated that, since the divorce, he had taken the children on four or five vacations. In addition to the trips with the children, Father took vacations to Africa (twice), the Dominican Republic, Mexico (four times), Canada, Thailand (twice), Colorado, San Diego, Orlando, Atlanta, Las Vegas, Boston, Louisiana, as well as an Alaskan Cruise. When asked how he was able to afford such vacations, Father responded that he has a friend who works for an airline who helped him fly for free, and that he also used frequent flyer miles. Father asserted that many of the trips were for business purposes, and that Owings Properties reimbursed him for his expenses on those trips. He conceded that one African Safari excursion had cost him about $6,500; he explained that he paid for that trip over a period of three years.

In addition, Father was asked about statements of his net worth from 2000, 2001, and 2002, given to financial institutions in order to obtain credit. Those statements reflected a net worth ranging between $700,000 and $1.2 million.

Father's accountant, Bean, also testified at the trial. Bean noted at the outset of his testimony that Owings had been audited by the IRS twice in the 1980's, and that no major problems were found with his income tax returns. Father's 2002 tax return showed a gross income of $91,494; Bean explained that this amount was a combination of Father's interest income and the total of all of the income reported on the K-1 form from his various businesses. Bean said that half of the income Father received from Owings Properties was reflected on the K-1 form, and the other half was reflected in a 1099 form. Bean acknowledged, however, that he was not the accountant for Father's business entities, and neither the K-1 forms nor the 1099 form were prepared by him.

Bean asserted that the income figures from Owings Properties reflected advances from the business entity, and that at the end of the year, if the draws exceeded the business income, Father would owe funds to the business. If Father's draws did not exceed the business income, then Father would be entitled to a payment. For the years in question, however, Father introduced no evidence that any such end-of-the-year reconciliation had occurred. Absent such an end-of-the-year reconciliation, Bean testified, those amounts would be carried over and usually resolved when the business is finally liquidated.

---

[7]Father indicated that he had a $90,000 line of credit with the bank, and that by the time of trial, he had borrowed almost the entire amount.

Bean was asked to explain the difference between the $112,175 in earnings reflected on the 1099 forms and the $91,494 gross income figure reflected on line 22 of Father's 2002 tax return. Bean stated that losses from other businesses reduced the amount of gross income shown on the tax return. He commented that, for the same reason, the bank statements showed $112,700 in deposits for business purposes in 2003, and yet Father's 2003 income tax return showed a gross income of $88,243. Basically, Bean said, Father can offset his passive income with his passive losses from other businesses, and this offset affects the gross income recorded.[8] Bean indicated that the income figures on the income tax returns are computer generated from a formula when the necessary figures from the K-1 forms are input, and that he would not be able to determine how the income figures were calculated without reference to the computer software. Bean acknowledged that he was not familiar with the definition of "gross income" under the Child Support Guidelines. He asserted, however, that the tax returns for 2001, 2002 and 2003 were an accurate reflection of Father's "gross income" for income tax purposes.

Bean said that he had not seen Father's bank account statements. Therefore, Bean could not comment on the discrepancy between the deposits in Father's bank accounts and the income figures on his tax returns. Bean said that Father's sole proprietorship, First Tennessee Development, was set up so that he could put some of his money into a business to take advantage of potential business-related deductions. He remarked that, although Father had planned to set up a business on the side, he "apparently never did."

On November 3, 2004, the trial court issued an oral ruling denying Mother's petition for modification, concluding that she had not established a significant variance between the amount of child support ordered in 1995 and the amount that would be due given his current income. The trial court recognized Father's testimony and pretrial affidavit, both of which indicated that he receives $8,000 per month from his partnerships, as well as $1,666.67 per month from periodic distributions. The trial court also noted Father's bank statements showing deposits in excess of $15,000 per month to Father's account, and his financial statements showing his net worth as ranging from $700,000 to $1.2 million. Nevertheless, the trial court concluded that Father's "tax returns provide the best evidence and the most accurate picture of this child support obligor's income." The trial court relied on an average of Father's total income[9] reflected in the tax returns for the years 2000, 2002, and 2003, and determined that his yearly average gross income was $86,508, and his average monthly income was $7,209.[10] The trial court found that an obligor with this level of income would owe

---

[8] Passive income or loss results from businesses in which the taxpayer does not materially participate in the business.

[9] The trial court states in its ruling that it relied on Father's adjusted gross income. However, comparing the figures upon which the trial court relied with the actual tax returns, it is apparent that the trial court used the total income figures from line 22, rather than the adjusted gross income figures from line 33.

[10] The trial court excluded 2001 figures from the equation; it found that the income reflected in that year was an anomaly due to the one-time capital gain realized by Father during that year that resulted in no money in Father's "pocket." The trial court's exclusion of this capital gain has not been appealed

$1,673 in support for two children, which was less than Father's original child support obligation of $1,700. Observing that Father was not a flashy dresser and that he lived in a modest home, the trial court surmised that Father was generally a credible witness who was "straightforward and forthright in his testimony." The trial court determined that Mother and accountant Bean were credible as well, noting that Bean "had a reputation to maintain." Thus, based on the income figures reflected in Father's tax returns, the trial court vacated its previous order increasing Father's monthly child support obligation and held that the original $1,700 per month child support amount should remain in force.

In light of this determination, the trial court found that Father had overpaid child support based on its earlier order increasing his obligation by $323 per month. Rather than requiring Mother to reimburse Father for this overpayment, the trial court held that "[t]he overpayment may be considered a partial payment toward the fees and expenses claimed by [Mother]." On December 1, 2004, the trial court entered an order consistent with its oral ruling. Mother filed a motion to reconsider. The trial court summarily denied the motion to reconsider, commenting that it had considered Father's bank statements and "could not determine . . . what the bank statements represented in terms of [Father's] income." Mother now appeals.

On appeal, Mother argues that the trial court erred in using the income figures in Father's tax returns to conclude that a significant variance had not been established. She notes that Father's bank statements for the years 2001 through 2003 reflect average deposits of over $15,000 per month and that, once that evidence was submitted, Father had the burden of showing what portion of those deposits did not constitute income. Because he offered no proof in this regard, she contends, Father's average monthly income should have been calculated based on the full amount of those deposits, and his child support obligation on that level of income would have been $3,200 per month. In addition, Mother argues, the trial court erred in relying on Father's tax returns when his own affidavit, testimony, bank statements, and other evidence showed that his income was at least $9,666.67 per month, which would have resulted in a monthly child support obligation of $2,215. Because Father's own assessment of his income, supported by the bank statements, was a more reliable measure of Father's income, the trial court should have determined his income level in accordance with that evidence, and, had it done so, a significant variance would have been established. In response, Father maintains that the trial court correctly concluded that there should be no increase in his child support obligation. He raises the issue on appeal that the trial court erred in allowing Mother to keep the overpayment in child support as attorney's fees, arguing that an award of fees to Mother was inappropriate in light of the fact that she was not the prevailing party.

The trial court's findings of fact are reviewed *de novo* on the record, presuming that those findings are correct unless the evidence preponderates otherwise. ***Huntley v. Huntley***, 61 S.W.3d 329, 334 (Tenn. Ct. App. 1991); Tenn. R. App. P. 13(d). The trial court's conclusions of law are reviewed *de novo*, with no such presumption of correctness. ***Huntley***, 61 S.W.3d at 334.

The principal issue in this appeal is whether the trial court erred in determining that Mother failed to establish a significant variance to support an increase in Father's child support obligation. The relevant statute provides:

> In cases involving child support, upon application of either party, the court shall decree an increase or decrease of such allowance when there is found to be a significant variance, as defined in the child support guidelines . . ., between the guidelines and the amount of support currently ordered . . . .

T.C.A. § 36-5-101(a)(1)(A) (Supp. 2004). The Child Support Guidelines ("Guidelines") in effect at the time the petition for modification was filed provided that a "significant variance" is "at least 15% if the current support is one hundred dollars ($100.00) or greater per month . . . ." Tenn. Comp. R. & Regs. 1240-2-4-.02(3) (2003).[11] Therefore, in other words, once the trial court determines the obligor parent's level of income as defined under the Guidelines, if the amount of child support correlating to that level of income is 15% more or less than the current level of child support, the trial court is obligated to order a corresponding increase or decrease in child support. The party seeking the modification has the burden of establishing a significant variance. *Turner v. Turner*, 919 S.W.2d 340, 345 (Tenn. Ct. App. 1995).

To determine whether a significant variance has been established, the trial court must first ascertain the obligor's actual income; this finding is the most important element of proof in setting or modifying a child support obligation. *See Eatherly v. Eatherly*, No. M2000-00886-COA-R3-CV, 2001 WL 468665, at *3-*4 (Tenn. Ct. App. May 4, 2001) (quoting *Turner*, 919 S.W.2d at 344). The Guidelines give a broad definition of "gross income" for child support purposes:

> all income from any source (before taxes and other deductions), whether earned or unearned, and includes but is not limited to, the following: wages, salaries, commissions, bonuses . . . .

Tenn.Comp.R. & Regs., ch. 1240-2-4-.03(3)(a)(1) (2003). Moreover, the Guidelines direct that "[v]ariable income such as commissions, bonuses, overtime pay, dividends, etc., should be averaged and added to the obligor's fixed salary." Tenn.Comp.R. & Regs., ch. 1240-2-4-.03(3)(b) (2003). This is significant in this case because it involves an obligor who is a self-employed business owner with a variety of proprietary interests. We have long recognized the difficulty of establishing the income of a self-employed business owner and the potential for manipulation of income in that situation. *See Koch v. Koch*, 874 S.W.2d 571, 578 (Tenn. Ct. App. 1993).

---

[11]The Child Support Guidelines, including the Guidelines' definition of "significant variance," were substantially revised, effective January 18, 2005. Tenn. Comp. R. & Regs. 1240-2-4-.01 to .09 (2005). The revised Guidelines provide that they "shall be applicable in any judicial or administrative action *brought . . . on or after the effective date of these rules*." Tenn. Comp. R. & Regs. 1240-2-4-.01(2)(a) (2005) (emphasis added). Because the pending petition was filed before January 18, 2005, the prior version of the Guidelines is the applicable one for purposes of our analysis. *Kaplan v. Bugalla*, 188 S.W.3d 632, 637 n.6 (Tenn. 2006).

In light of the applicable law, we consider Mother's argument that the evidence preponderates against the trial court's finding that Father's income is accurately reflected on his tax returns. As part of her argument, Mother in effect contends that the trial court erred in finding Father to be a credible witness, pointing to Father's "lifestyle," his financial statements showing a net worth ranging from $700,000 to $1,200,000, his purchase of a late-model automobile and a boat, and his numerous vacations abroad. Mother notes that Father produced no documentation supporting his assertions that numerous deposits to his personal bank accounts were not income, but instead were transfers between accounts, withdrawals from his children's bank accounts, loans from his father, and the like. Mother maintains that Father's uncorroborated explanations of the entries on his bank statements should be disregarded, and that his income should be ascertained from the deposits reflected on his bank statements rather than on the tax returns relied upon by the trial court.

In support, Mother cites prior cases in which this Court has grappled with determining the income of a self-employed obligor parent. In ***Eatherly***, we stated: "While a parent's income is generally established with proof such as pay stubs, personal tax returns, or other documents, other information is sometimes needed to determine the parent's actual ability to provide support." ***Eatherly***, 2001 WL 468665, at \*4-\*5. Furthermore, "[w]here issues are raised about actual income from self-employment, information beyond pay stubs or individual tax returns may be needed." ***Id.*** at \*5.

In particular, Mother cites a recent decision in which this Court affirmed a trial court's determination that an obligor parent's bank deposits, as opposed to his tax returns, were the appropriate measure of his income. ***Smith v. Smith***, No. E2003-02642-COA-R3-CV, 2004 WL 2964695 (Tenn. Ct. App. Dec. 22, 2004). In ***Smith***, the parties had been divorced for several years, the mother was the primary residential parent for the children, and the father paid child support of $1,200 per month under the original divorce decree. The mother filed a petition for modification of the father's child support obligation based on an alleged increase in the father's income. ***Smith***, 2004 WL 2964695, at \*1. At the trial in the matter, the mother sought to prove the father's increased income by submitting three years of his bank statements showing deposits of $111,240 (2000), $144,267 (2001), and $172,632 (2002). The father asserted in his testimony that the deposits did not reflect his actual income, but rather that his income should be determined from his federal income tax returns, showing income of $69,251 (2000), $71,356 (2001), and $63,724 (2002). He explained that the discrepancy between the bank deposits and the income shown on his tax returns was due to the fact that some deposits were loans from his father, reimbursement of business expenses, and transfers from other accounts, none of which constituted income to him. The trial court rejected the father's argument and relied on the bank statements to ascertain his income. ***Id.*** at \*2. The trial court reduced the father's deposits by the amounts that were proved to be loans or reimbursements and determined that the father's income was $90,262 (2000), $130,231 (2001), and $97,832 (2002). The trial court found that the mother had "proven that moneys [sic] went into various [bank] accounts . . .," and that there was "no other proof as to where the rest of those funds have come from." ***Id.***

On appeal in *Smith*, this Court affirmed the trial court's reliance on the deposits reflected in the father's bank statements as the proper measure of his income. The appellate court noted that the father had relied solely on his tax returns and submitted no proof apart from his own testimony, as to any transfers between accounts or business expense reimbursements. In this situation, the appellate court concluded that the trial court appropriately used the bank statements as the starting point for calculating the father's income. *Id.* at *3. Beginning with the deposits, the appellate court made adjustments to the amounts consistent with the proof regarding the father's loans from his father, the father's use of a company vehicle, and IRA distributions. Ultimately, after making the adjustments and determining the father's income for the years 2000, 2001, and 2002, the *Smith* court remanded the matter to the trial court to determine the appropriate level of child support based on its modified finding of income. *Id.* at *4.

Mother also relies on *Kirchner v. Pritchett*, No. 01A01-9503-JV-00092, 1995 WL 714279 (Tenn. Ct. App. Dec. 6, 1995), in which the appellate court held that, when the custodial parent submits credible evidence of the noncustodial parent's income, the noncustodial parent then has the burden of producing evidence to dispute it, because the noncustodial parent has the relevant information and records within his control. The *Kirchner* court reasoned:

> [T]he custodial parent may present evidence of the non custodial parent's income obtained during discovery . . . . Thereafter, the burden shifts to the noncustodial parent to dispute the custodial parent's evidence, to present proof of other factors affecting the amount of support, or to demonstrate why the trial court should depart from the guidelines. The risk of failure or inability to produce evidence of the noncustodial parent's income and expenses should not fall on the custodial parent. This information is within the noncustodial parent's control. Thus, if the noncustodial parent has failed or refused to produce evidence of his or her income prior to the hearing, the burden of producing satisfactory evidence of income and expenses should be placed on the noncustodial parent – the party most able to provide it.

*Kirchner*, 1995 WL 714279, at *8 (footnotes and citations omitted). Mother maintains that requiring the noncustodial parent to dispute the custodial parent's reliable evidence of actual income is consistent with the rule of evidence that the burden of production should be placed on the party who has primary control over the knowledge of the evidence. *See Smith v. Darmohray*, No. M2003-00236-COA-R3-CV, 2004 WL 904095, at *4-*5 (Tenn. Ct. App. Apr. 27, 2004).

Indeed, the facts in some of the cases cited by Mother are similar to the facts presented in the trial court below, particularly the facts in *Smith v. Smith, supra*. There is, however, an important difference between *Smith* and the circumstances in this case. In *Smith*, the trial court chose not to base its decision on the obligor parent's tax returns, but instead relied on the deposits in the bank accounts and, in addition, declined to credit the obligor parent's explanations of the deposits unless they were corroborated. In this case, the trial court's actions were the converse of those in *Smith*;

the trial court below expressly credited Father's testimony, relied on his tax returns, and disregarded the evidence of deposits reflected on his bank statements.

While Mother asks us to effectively disregard the trial court's express finding on Father's credibility, we find no basis in the record for doing so. We are mindful that the trial court is in the best position to assess the credibility of the witnesses; its determinations of credibility are entitled to great weight on appeal and will not be reversed absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995). Therefore, since the trial court found both Father and his accountant, Bean, to be straightforward and truthful in their testimony, we review the appellate record with appropriate deference to these findings on credibility.

In his testimony, Father stated that, beginning in 2002, he had received an average of $8,000 per month from Owings Properties. In addition, Father said, he received $3,200 per quarter in distributions from various property interests. When asked to explain entries on his tax returns, Father responded that he was "not an accountant" and could not explain the returns, and did not know how to interpret a K-1 form. When asked how he was "certain" that he was only "paid $8,000 a month," Father responded, "Because I make my own deposits and I know what I get." In 2001, Father received $10,000 per month from Owings Properties, because 2001 was a "better year." Father maintained that his tax returns reflected all of his income from all sources.

In addition, Father's affidavit of income and expenses filed in advance of trial stated that he had an average monthly gross income of $9,666.67.

Father's accountant, Bean, testified that he prepared Father's income tax returns, but did not do the accounting for Father's businesses. Therefore, in preparing Father's tax returns, Bean relied on K-1 forms and other documents prepared by the accountant for Father's businesses and furnished to Bean by Father.

In preparing Father's tax returns, Bean said, the approximately $8,000 per month that Father received from Owings Properties was a "draw" against Father's earnings in the partnership, and not "actual income." Bean explained that if Father drew out "too much money" from his partnership, he would "at some point in time" have to either stop taking out so much money or put money back into the business. If Father withdrew too much money from his partnership account, the deficit could carry forward until it was offset by future profits or the business was liquidated. Bean did not testify that such a correction had ever been made. He acknowledged that there could be a difference between the total amount of the monies Father received from his businesses and the gross income figure on Father's tax returns "because of the way the tax laws work, you have pass and loss carryovers from previous years that might . . . reduce the total income . . . ." Bean maintained, however, that Father's tax returns accurately reflected his "gross income." Bean said that he had no knowledge of deposits or withdrawals from Father's bank accounts. Bean had never seen a copy of the Child Support Guidelines and acknowledged that the definitions of income under the tax code and the Guidelines were not the same.

In light of this testimony from both Father and Bean, we examine the trial court's finding that Father's income for purposes of determining child support correlated with the "gross income" figures on Father's income tax returns. For guidance, we consider this Court's decision in *Abercrombie v. Abercrombie*, No. E2003-01226-COA-R3-CV, 2004 WL 626713 (Tenn. Ct. App. Mar. 29, 2004). In *Abercrombie*, some time after the parties' divorce, they agreed that the father would be the primary residential parent for the parties' children, and they also agreed that the mother would not pay child support. A couple of years later, the father filed a petition to require the mother to pay child support. The mother was not employed but received monies from her investment portfolio. At the hearing on the father's petition, the mother's accountant, who prepared her tax returns, testified that, considering various losses that the mother sustained, she had no income and, in fact, had sustained an overall loss. *Id.* at *2. Utilizing the figures to which the mother's accountant testified, the trial court concluded that the mother owed no child support under the Guidelines and dismissed the father's petition. *Id.* at *2, *3. The father appealed.

On appeal, this Court observed:

> While a federal income tax return is a valuable source of data when calculating an obligor's child support obligation under the Guidelines, it is important to recognize that the object of a tax return is very different from that of the Guidelines. A tax return is designed to determine "taxable income" under the federal tax code; the Guidelines are designed to determine "net income" *as that concept is defined in the Guidelines*. The Guidelines' "net income" concept is vastly different from the federal tax code's concept of "taxable income." By the same token, the Guidelines' concept of "gross income" is not the same as the federal tax code's concept of "adjusted gross income." Thus, while a tax return, generally speaking, will yield valuable *data* for a trial court in setting child support, it is a mistake to use the federal tax return as if the concepts mentioned above were interchangeable. They are not.

*Id.* at *7. The court commented that, under the Guidelines, the term "gross income" has an "expansive definition." *Id.* at *7 n.1. Utilizing the Guidelines' definition, the appellate court in *Abercrombie* found that the mother had "significant gross income" and remanded the cause to the trial court to set an appropriate amount of child support. *Id.* at *8.

In this case, as in *Abercrombie*, we are governed by the income definitions in the Child Support Guidelines, not the tax code. Bean testified forcefully that Father's tax returns accurately reflected his "gross income" as derived from the K-1 forms and other documentation furnished to Bean. As in *Abercrombie*, "[i]n essence, the witness was expressing what is clearly true *as a matter of tax law*. . . ." *Id.* at *2. Bean did not testify as to Father's "gross income" under the Guidelines definition and acknowledged there was a difference.

In contrast, Father's testimony on the monies he received, as well as the pretrial affidavit detailing his income and expenses, fall squarely within the "expansive" Guidelines definition of

income. In his pretrial affidavit, Father stated that he received $9,666.67 per month as his "average monthly gross income." This generally correlates with his testimony before the divorce referee and the trial court, in which he consistently maintained that he received $8,000 per month from Owings Properties, as well as $3,200 quarterly as distributions from his various property interests.[12]

To be sure, Bean characterized the $8,000 per month from Owings Properties as a "draw," subject to correction later if it turned out that the partnership was more or less profitable than projected. However, neither Father nor Bean testified that any such recapitulation had taken place. Under the Guidelines definition, Father's gross income includes "all income from any source (before taxes and other deductions), whether earned or unearned . . . ." Therefore, regardless of the profitability of Owings Properties, if Father received $8,000 per month and repaid none of it, the full amount would be considered "income" for child support purposes.

Mother urges us to also include in Father's income calculation monies he received from his father. Certainly Father's testimony on this issue was thin; although he termed these monies as "loans," there was no documentation, no testimony from his father, no indication that any of the monies had been repaid or ever would. Nevertheless, since Father characterized these monies as "loans" in his testimony and the trial court expressly found Father to be a truthful witness, we decline to include these amounts in the determination of Father's income.

Likewise, Mother urges us to ascertain Father's income from the deposits to his bank account. Again, Father's testimony was generalized on many of the deposits, indicating that the bank account deposits would not be an accurate measure because on numerous occasions he simply transferred monies from one account to the other. According to Father's interpretation of the bank statements, his monthly income was $9,768, which is generally consistent with his testimony that his monthly income was $9,666.67. Because the trial court found Father's testimony to be credible, his testimony must be deemed sufficient and we decline to use the full amount of the bank account deposits to measure his income.

Therefore, based on Father's testimony and the definition of "gross income" in the Child Support Guidelines, we conclude that the evidence preponderates against the trial court's finding of no significant variance and find that, instead, that Father's monthly income should be deemed $9,666.67, as stated in his pretrial affidavit and his testimony. This amount of income requires that we vacate the trial court's decision on Mother's petition and remand to the trial court for a

---

[12]Interestingly, in his appellate brief, counsel for Father characterizes Father's testimony as a "misinterpretation" of his own income, which was "clarified" by Bean's testimony. However, at no point during the trial did Father's counsel indicate that Father's testimony was a mistake; nor did he seek to have Father correct his testimony. In Father's testimony before the divorce referee in February 2004, as well as his trial testimony in October 2004, he maintained that he received $8,000 per month from Owings Properties, as well as $3,200 quarterly in distributions. Bean testified in both proceedings. In fact, when this amount was challenged by counsel for Mother on cross-examination, Father verified and explained the income on his affidavit. Father emphasized that he was certain of the amount "[b]ecause I make my own deposits and I know what I get."

determination of the appropriate level of child support, considering all the relevant facts. *See Smith*, 2004 WL 2964695, at \*4.

Father asserts on appeal that, if this Court finds a significant variance, his child support obligation would be calculated under the new Child Support Guidelines which take into account the income of the obligee parent. He cites no authority for this assertion, and it is clear that Father's obligation would be determined in accordance with the Guidelines in effect at the time Mother's petition was filed. *See Kaplan v. Bugalla*, 188 S.W.3d 632, 637 n.6 (Tenn. 2006).

Mother also seeks her attorney's fees for the proceedings below and for this appeal. By statute, a primary residential parent who incurs attorney's fees in successfully modifying a child support order is entitled to an award of reasonable attorney's fees. Tenn. Code Ann. § 36-5-103(c). In the proceedings below, Mother was awarded attorney's fees only to the extent of Father's "overpayment" of child support. Because we have reversed the trial court's finding of no significant variance and vacated the trial court's denial of Mother's petition for an upward modification of Father's child support obligation, we modify the judgment to award Mother the full amount of her reasonable attorneys's fees for the underlying action. In addition, we grant her request for attorney's fees for this appeal, and remand the cause to the trial court for a determination of the appropriate amount of both attorney's fee awards. This pretermits any other issues raised on appeal.

The decision of the trial court is vacated in part, modified in part, and the cause is remanded for further proceedings not inconsistent with this Opinion. Costs of this appeal are assessed against Respondent/Appellee William Albert Owings, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE